**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

GILBERT BAKER FOUNDATION; CHARLES
BEAL; VILLAGE PRESERVATION; and EQNY
FUND, INC. d/b/a EQUALITY NEW YORK,

Plaintiffs,

<i>v.</i>

U.S. DEPARTMENT OF THE INTERIOR and DOUG
BURGUM, in his official capacity as
Secretary of the U.S. Department of the Interior,
1849 C Street, N.W.,
Washington, D.C. 20240;

NATIONAL PARK SERVICE and JESSICA
BOWRON, in her official capacity as
Acting Director of the National Park Service,
1849 C Street, N.W.,
Washington, D.C. 20240; and

AMY SEBRING,
in her official capacity as
Superintendent of Manhattan Sites,
c/o Federal Hall National Memorial,
26 Wall Street,
New York, NY 10005;

Defendants.

**No. 26 Civ. 1317**

---

## INTRODUCTION

1.     The Stonewall National Monument in Greenwich Village, New York City, is the first national monument in the United States dedicated to the LGBTQ+[1] rights movement. It commemorates the historic uprising that occurred in the same location a half-century ago following an infamous police raid on the Stonewall Inn, an underground gay bar at the time. That incident is widely considered to be the birth of the LGBTQ+ rights movement in the United States.

---

[1] "LGBTQ+" refers to lesbian, gay, bisexual, transgender, and queer persons, including other sexual and gender minorities.

2.      In 2022, after extensive advocacy by the LGBTQ+ community, the National Park Service ("NPS") installed a flagpole inside the Stonewall National Monument to fly a Pride flag. The Pride flag, which generally consists of differently colored horizontal stripes representing a rainbow, has been and remains a widely recognized symbol of LGBTQ+ equality since the 1970's.

3.      At the time, the NPS explained this watershed event—the first Pride flag flown permanently on federal lands—by pointing to "the significance of the rainbow flag to Stonewall National Monument and the community" and NPS's commitment "to telling the complex and diverse histories of all Americans." The official NPS-sanctioned flag at Stonewall typically bears the Park Service's logo along with the inscriptions "STONEWλLL National Monument" and "Established 2016."

4.      But on or about February 9, 2026, the federal government abruptly changed course and took down the official Pride flag from Stonewall. This sudden decision has sparked widespread protest among New York's LGBTQ+ community.

5.      The government claims the removal is necessary to comply with NPS and Department of Interior (DOI) official policies that purportedly prohibit the flying of anything but the United States flag, DOI flags, and the POW/MIA flags in national parks. The NPS and DOI policies, however, require no such thing. In fact, the opposite is true: The policies the government says require removing the Pride flag *expressly permit* the NPS to fly other flags that provide historical context to national monuments—which is precisely what the NPS official Pride flag did at Stonewall for many years.

6.      The removal of the official Pride flag is a textbook example of an arbitrary and capricious action. Simply put: The government acts arbitrarily when it claims its actions are mandated by a policy that—on its face—says no such thing.

7.      This was no careless mistake. The government has *not* removed other historical flags at other national monuments, most notably Confederate flags. Meanwhile, the assault on Stonewall is the latest example in a long line of efforts by the Trump Administration to target the LGBTQ+ community for discrimination and opprobrium. In February 2025, for instance, the administration removed the word "transgender" from prominent sections of the Stonewall monument's website, as part of its wider campaign to demean and erase the transgender community. The Trump Administration has deleted numerous NPS websites discussing LGBTQ+ history; fired at least one federal employee for displaying a pride flag in his office; banned the use of pronouns in email signatures; renamed a John Lewis-class replenishment oiler named after Harvey Milk, a pioneering gay rights leader who served as a Navy officer and one of the first openly gay elected officials in the United States; and—in a particularly absurd example—even flagged for deletion images of the B-29 aircraft Enola Gay, the plane that dropped the first atomic bomb, apparently because the images included the word "Gay." This pattern of systemic targeting of the LGBTQ+ community—combined with the starkly disparate treatment of the Pride flag—demonstrates that the decision to alter the Stonewall monument was not just a mistake. It was based on an impermissible animus.

8.      In addition, the government's removal of the Pride flag from the Stonewall monument is a clear violation of the Presidential proclamation that established the monument and its Foundation Document that plainly require the NPS "to interpret the monument's objects, resources, and values related to the LGBT civil rights movement."

9.      Finally, the federal government failed to comply with Section 106 of the National Historic Preservation Act and its implementing regulations. In particular, in its rush to remove the

Pride flag from the Stonewall National Monument, the government did not consult with relevant state officials and the public—as mandated by law.

10.    This case concerns one flag. But it is about so much more. The Pride flag symbolizes the dignity and respect for which members of LGBTQ+ community have so long fought and so rightfully deserve. Its colors reflect the diversity of the LGBTQ+ community and the spectrum of human sexuality and gender.

11.    Plaintiffs are an individual and a collection of prominent community organizations in New York, each of whom has been harmed by the flag's removal and has standing to sue. They bring this action under the Administrative Procedure Act to vacate the NPS's decision and restore the official Pride flag to Stonewall. At best, the federal government has obviously misread its own policies. At worst, the government was motivated by animus toward the LGBTQ+ community. And at minimum, the government failed to follow the processes for a decision of this nature. Either way, the government's actions were arbitrary and capricious, and contrary to law. This Court can, and should, intervene.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this matter arises under federal law, namely, the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

13.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States, the Stonewall National Monument is located in this District, and a substantial part of the events giving rise to the claims occurred in this District.

## FINAL AGENCY ACTION

14.    This action challenges final agency action reviewable under the Administrative Procedure Act, 5 U.S.C. § 704.

4

15.     On or about February 9, 2026, the NPS removed the Pride flag from the Stonewall National Monument.

16.     The removal of the Pride flag is final agency action within the meaning of 5 U.S.C. § 704 because:

    a.   It represents the consummation of the NPS's decisionmaking process regarding whether the Pride flag may be displayed at the Stonewall National Monument;

    b.   It is a definitive determination by the NPS that the Pride flag shall not be displayed at the monument;

    c.   The removal determines the legal rights and obligations of Plaintiffs and others affected by flag displays at the monument;

    d.   Legal consequences flow from the removal, including the denial of Plaintiffs' ability to experience the monument with LGBTQ+ symbols integral to its designated historical purpose and the frustration of the monument's mandate to preserve and interpret LGBTQ+ history;

    e.   The removal is complete, operational, and not tentative or subject to reconsideration;

    f.   NPS has not stated any intention to restore the Pride flag or to reconsider its removal decision;

    g.   No further agency action is required or contemplated. The removal is a completed act with present legal effect.

17.     The removal of the NPS-sanctioned Pride flag remains in effect. Notwithstanding the temporary raising of an unofficial Pride flag by community members, Defendants have not restored the NPS-sanctioned Pride flag. Instead, Defendants continue to prohibit its display.

Indeed, they have specifically stated that NPS is "going to continue to adhere to the existing rules and not make exceptions for Stonewall." Noorulain Khawaja, *Advocates Bring Pride Flag Back To Stonewall*, NY1 (Feb. 12, 2026), https://ny1.com/nyc/all-boroughs/news/2026/02/13/advocates-bring-pride-flag-back-to-stonewall [https://perma.cc/46UX-BCK8].

18.     This action is ripe for review because the removal has been completed, is causing present and ongoing injury to Plaintiffs, presents purely legal questions suitable for judicial resolution, and withholding review would cause substantial hardship to Plaintiffs.

19.     Plaintiffs have no other adequate remedy at law. The removal provides no administrative appeal process, and monetary damages cannot remedy the ongoing erasure of LGBTQ+ history and symbols at the Stonewall National Monument or restore Plaintiffs' ability to experience the monument as designated.

## PARTIES

### *Plaintiffs*

20.     Plaintiff the GILBERT BAKER FOUNDATION is a non-profit organization founded to protect and extend the legacy of Gilbert Baker, the creator of the Rainbow Pride flag. The foundation's mission is to record and promote the history of the creation of the Rainbow Flag and its impact on the world, and to educate future generations about the Rainbow Flag.

21.     To execute its mission, among other efforts, the Gilbert Baker Foundation creates educational programs about the history of the Rainbow Pride flag and works with state and local governments on implementing solutions for displays of the Rainbow Pride flag.

22.     For example, in collaboration with ReportOUT, the Gilbert Baker Foundation developed an award-winning "Flag in the Map" project, which documented people flying their

Pride flags in all parts of the world. *See Flag In the Map* (accessed Feb. 17, 2026), https://gilbertbaker.com/flaginthemap/ [https://perma.cc/9HV9-ES7T].



23.     In the last several years, in response to efforts to ban the Pride flag around the country, the Gilbert Baker Foundation has opposed these bans through advocacy, community outreach, and litigation. Most recently, the Gilbert Baker Foundation supported litigation against a municipal ban of Pride flags in Hamtramck, Michigan.

24.     In collaboration with the ACLU, the Gilbert Baker Foundation developed the "Save the Rainbow Flag" initative, a dynamic tool kit designed to help communities push back against efforts trying to ban the flag.

25.     The Gilbert Baker Foundation has also been involved in the response to the government's removal of the Rainbow Pride flag from the monument including through participating in advocacy and by expending its resources to provide the Rainbow Pride flag that

was raised by local politicians and advocates on February 12, 2026 in place of the official NPS-sanctioned flag.

26.    The removal of the official Pride flag injures the Gilbert Baker Foundation because it frustrates the Gilbert Baker Foundation's mission in the following ways:

     a.    The removal destroyed resources the Foundation invested in advocating for the display of the Pride flag at Stonewall.

     b.    The removal has forced the Foundation to divert resources from its educational and partnership programs towards defensive efforts opposing the removal.

     c.    The Foundation has expended resources on the creation and installation of a replacement flag raised by community members on February 12, 2026.

     d.    By losing the Stonewall National Monument as a premiere example of a government-endorsed display of the Pride flag, the Foundation will be required to revise its materials and messaging to prospective government partners.

27.    Plaintiff CHARLES BEAL is the President of the Gilbert Baker Foundation, a lifelong social activist, and an award-winning art director for film and television. Mr. Beal worked closely with Gilbert Baker beginning in 1994 when he assisted Mr. Baker with the creation of the Mile Long Rainbow Flag for Stonewall 25. Mr. Beal continued to collaborate with Mr. Baker on numerous projects including Worldpride 2000 in Rome and other pride celebrations around the globe.

28.    Mr. Beal has been visiting the Stonewall Inn and the surrounding park regularly since 1993 and has visited the Stonewall National Monument countless times since its creation in 2016. He intends to continue visiting the monument several times a year.

29.    Mr. Beal visits the monument because of its significance to the LGBTQ+ liberation movement and has concrete plans to visit on June 2, 2026.

30.    The official Pride flag is integral to Mr. Beal's experience of the monument as a site commemorating LGBTQ+ history and rights. The Pride flag is meaningful to Mr. Beal both because of its importance to the LGBTQ+ community and because of his connection to Mr. Baker. Importantly, the Pride flag installation by the NPS inside the monument—the first such display on federal property—is significant to Mr. Beal because it signals acceptance by the federal government and the enormous progress achieved by the LGBTQ+ community, which was facilitated by the events at Stonewall.

31.    The removal of the official Pride flag has deprived and continues to deprive Mr. Beal of the aesthetic, educational, and historical experience the monument was designated to provide.

32.    The temporary, unofficial Pride flag raised by activists and local politicians does not repair the injury that the government caused Mr. Beal by taking down the official flag.

33.    Plaintiff VILLAGE PRESERVATION (formerly the Greenwich Village Society for Historic Preservation) is a non-profit organization founded to document, celebrate, and preserve the special architectural and cultural heritage of the New York City neighborhoods of Greenwich Village, the East Village, and NoHo.

34.    Village Preservation has long advocated for formal recognition of historic sites related to LGBTQ+ history. For example, in 2019, Village Preservation secured New York City landmark status for the Lesbian, Gay, Bisexual & Transgender Community Center and the Gay Activists Alliance Fire House. In 2022, it obtained a similar designation for Julius' Bar, a historic gay bar in Greenwich Village.

9

35.    In 1999, Village Preservation co-nominated the Stonewall Inn and the surrounding streets and park for listing on the National Register of Historic Places. On June 21, 1999, the Stonewall Inn and its surroundings were placed on the National Register of Historic Places. The Stonewall Inn was the first—and for many years the only—site in the National Register of Historic Places listed because of its connection to LGBTQ+ history.

36.    In 2014, Village Preservation formally proposed the Stonewall Inn for individual landmark designation to ensure its LGBTQ+ history was recognized and the features which related to the historic events which took place there were preserved. In June of 2015, after a year-and-a-half campaign supported by elected officials, LGBTQ+ community groups, and other preservation organizations, the Landmarks Preservation Commission designated Stonewall an individual landmark, making it the first site designated by the City of New York due to its LGBTQ+ history.

37.    In 2016, Village Preservation was part of the coalition of groups and elected officials that spearheaded the drive to designate Stonewall as a National Monument. Village Preservation's decades-long advocacy was essential to establishing Stonewall National Monument's protected status and official recognition of LGBTQ+ history.

38.    The Stonewall National Monument represents the culmination of Village Preservation's decades-long effort to preserve LGBTQ+ history and serves as the organization's flagship example of successful historic preservation advocacy:

    a.    Village Preservation cites its role in achieving Stonewall's designation as one of its key organizational accomplishments.

    b.    The monument is featured prominently in Village Preservation's educational materials, fundraising appeals, and advocacy campaigns as evidence that historic preservation can successfully recognize and protect LGBTQ+ heritage.

  c. Village Preservation uses Stonewall National Monument as a model when advocating for landmark designation of other LGBTQ+ sites, demonstrating to government officials and the public that LGBTQ+ history warrants official recognition and protection.

  d. The monument's status validates Village Preservation's organizational approach of combining architectural preservation with cultural history preservation, particularly for marginalized communities.

39. The removal of the Pride flag injures Village Preservation by:

  a. Undermining the organization's historic achievement: Village Preservation spent decades advocating for Stonewall's recognition as a site of LGBTQ+ significance. The removal of the Pride flag—the international symbol of LGBTQ+ identity—contradicts and undermines the very purpose for which Village Preservation fought to have the monument designated.

  b. Damaging educational programming: Village Preservation's tours, public programs, and educational initiatives that feature Stonewall National Monument are perceptibly impaired because the organization must now explain why the Pride flag is absent from a monument specifically designated to commemorate LGBTQ+ history, rather than using the site to illustrate successful preservation of LGBTQ+ heritage.

  c. Undermining advocacy for other LGBTQ+ sites: Village Preservation's ongoing efforts to secure landmark designation for other LGBTQ+ historic sites are impeded because government officials and the public may question whether landmark designation actually protects LGBTQ+ history when the federal

government removes LGBTQ+ symbols even from a National Monument designated for that purpose.

d. Contradicting organizational message: Village Preservation's core message—that historic preservation is an effective tool for recognizing and protecting LGBTQ+ heritage—has been officially contradicted by the federal government's actions at the very site that was meant to exemplify this principle.

40.    Additionally, the removal of the Pride flag injures Village Preservation by diverting its resources in the following ways:

a. Village Preservation has been forced to devote staff time to responding to inquiries from members, donors, elected officials, media, and the public about why the Pride flag was removed from a monument that Village Preservation helped create specifically to preserve LGBTQ+ history.

b. Village Preservation has had to revise educational materials, tour scripts, map content, and advocacy documents that previously presented Stonewall National Monument as an example of successful federal recognition of LGBTQ+ history.

c. Village Preservation has devoted organizational resources to advocacy and public statements opposing the removal, including coordination with coalition partners and media outreach.

d. Village Preservation has expended reputational resources defending Village Preservation's effectiveness to donors and supporters who question whether the organization's decades of work on Stonewall has been undone by federal government actions.

41.     Plaintiff EQNY FUND, INC., d/b/a EQUALITY NEW YORK, is a non-profit advocacy organization that advances the lives of all LGBTQ+ New Yorkers and their families. Founded in 2017, Equality New York has more than 4,500 members throughout New York State. Collectively, its members engage and mobilize in ways that help Equality New York reach their mission of advancing the lives of all LGBTQ+ New Yorkers and their families.

42.     Some members of Equality New York have participated in advocacy on behalf of LGBTQ+ people since the Stonewall uprising, including some participating in the uprising itself. Members of Equality New York also regularly visit the Stonewall National Monument to observe and experience the historical site and its symbols of LGBTQ+ history, including the Pride flag.

43.     Due to the importance of the Stonewall National Monument to its members, Equality New York has worked to secure state and local funding for the monument and its surrounding environments.

44.     For example, Eunic Ortiz, a cofounder of Equality New York and a lifetime member, was integral to making the park a national monument and has particular expertise in both the history of the LGBTQ+ movement and the events leading up to monument's establishment. She and her wife, like many same-sex couples, were married at the park. Defendants' attempts to minimize and chip away at the monument's symbolism is an attack on the very history Ortiz and other members seek to pass down to future generations.

45.     Equality New York also uses the Stonewall National Monument for events. Some of its members have also formulated trainings and educational campaigns regarding the history of the LGBTQ+ movement and its fight for equality. Some of these trainings and campaigns refer to and discuss the Stonewall National Monument and the NPS-sanctioned Pride flag serves a critical

role in these members' ability to discuss the LGBTQ+ movement and Stonewall with full historical context and with the symbolism for which the monument was designated.

46.     Melissa Sklarz is another lifetime Equality New York member and long-time transgender activist who joined in promoting the national monument and participated in many rallies that demonstrated the core values that animate the national monument's purpose. *See*, *e.g.*, The Obama White House, *Announcing the Stonewall National Monument*, YouTube (June 24, 2016) (at 1:39-1:47), https://www.youtube.com/watch?v=ywtvJyXDWkk. Seeing the monument's symbolism diminished and feeling the animus Defendants' actions impart is both dehumanizing and painful to Ms. Sklarz.

47.     Another elder transgender activist and Equality New York member, Tanya Asapansa Walker shares the same pain and humiliation. Tanya provides programing that teaches about the progress transgender members of the LGBTQ+ community have made; however, the government's attempts to walk-back the monument's proud symbolism—along with the vicious campaign of animus toward and erasure of transgender people the government wages—have been devastating.

48.     Following Defendants' actions to take down the NPS-sanctioned Pride flag from Stonewall, Equality New York heard from its members who expressed outrage and concern over the removal of the flag. Among the concerns from Equality New York's members were the erasure of such an important symbol for their community and fears that the removal represented a further escalation of the acts by the current administration targeting the LGBTQ+ community for erasure and discrimination. Equality New York members further expressed fear that removal of the flag constituted an initial salvo in eliminating or de-designating the Stonewall National Monument, an

important historical marker that recognized the identities, struggles, and hopes for a more inclusive future of the LGBTQ+ people.

49.     Since the removal of the NPS-sanctioned Pride flag from Stonewall, consistent with the calls by its members, Equality New York has contacted and worked with federal, state, and local officials to have the Pride flag reinstated at Stonewall National Monument. This has included working with local officials and community members to raise an unofficial Pride flag at the Monument next to the United States flag.

50.     Equality New York brings this suit on behalf of itself and its members.

51.     The removal of the Pride flag deprives the members of Equality New York of the ability to experience the monument with the full historical context and symbolism for which it was designated, causing aesthetic and informational injury.

52.     The claims asserted are germane to the Equality New York's mission of advancing the lives of all LGBTQ+ New Yorkers and their families.

53.     Neither the claims asserted nor the relief requested requires the participation of individual members in this lawsuit.

*Defendants*

54.     Defendant DOUG BURGUM is the Secretary of the United States Department of the Interior. As Secretary, he has ultimate authority over the National Park Service and its management of national monuments, including the Stonewall National Monument. He is sued in his official capacity.

55.     Defendant United States DEPARTMENT OF THE INTERIOR ("DOI") is a department of the executive branch of the United States government. DOI oversees the National Park Service and is responsible for the management and administration of the nation's national

monuments, including the Stonewall National Monument. DOI is an agency within the meaning of 5 U.S.C. § 551(1).

56.    Defendant JESSICA BOWRON is the Acting Director of the National Park Service. As Acting Director, she is responsible for overseeing the operations, management, and policies of the National Park Service, including those governing the display of flags and interpretive materials at national monuments. She is sued in her official capacity.

57.    Defendant NATIONAL PARK SERVICE ("NPS") is an agency of the United States government within the DOI, responsible for managing national parks and monuments, including the Stonewall National Monument. Upon information and belief, NPS removed the official Pride flag from the Stonewall Memorial. NPS is an agency within the meaning of 5 U.S.C. § 551(1).

58.    Defendant AMY SEBRING is, upon information and belief, the Superintendent of Manhattan Sites for the NPS. In that capacity, she has direct supervisory authority over the Stonewall National Monument and its day-to-day operations, including decisions regarding the display of flags and other materials at the monument. She is sued in her official capacity.

## FACTUAL BACKGROUND

### *The Stonewall Uprising*

59.    In the early morning of June 28, 1969, New York City police raided the Stonewall Inn, a gay bar in Greenwich Village.

60.    The raid sparked days of protests and riots in the surrounding streets, marking a watershed moment in the LGBTQ+ rights movement.

61.     Prior to Stonewall Uprising, LGBTQ+ individuals faced pervasive discrimination, criminalization, and violence. Police raids of gay bars were common, and LGBTQ+ people had few legal protections, little organized advocacy, and scant political power.

62.     The Stonewall Uprising catalyzed the modern LGBTQ+ rights movement, leading to the formation of advocacy organizations, annual Pride marches, and decades of progress toward equality.

63.     The first Pride march occurred on June 28, 1970, the one-year anniversary of the Stonewall uprising.

64.     Stonewall has become a global symbol of LGBTQ+ resistance and liberation. LGBTQ+ events and organizations around the world have been named in honor of Stonewall.

*The Pride Flag*

65.     The first Pride flag was created in 1978 by Gilbert Baker. The original rainbow design contained eight colors, with a specific meaning assigned to each color: hot pink (sex), red (life), orange (healing), yellow (sunlight), green (nature), turquoise (magic/art), indigo (serenity), and violet (spirit).

66.     The design of the Rainbow Pride flag soon changed to six colors (red, orange, yellow, green, blue, violet). It has become an internationally recognized symbol of LGBTQ+ identity, community, and rights.

67.     For example, in June 2015, in the wake of the Supreme Court's landmark ruling in *Obergefell v. Hodges* that proclaimed that the fundamental right to marry is guaranteed to same-sex couples under the U.S. Constitution, the White House was illuminated in rainbow colors for an evening.



68.    In recent years, the Pride flag has continued to evolve to reflect the diversity within the LGBTQ+ community and the broader world.

69.    For example, the Progress Pride flag, designed by Daniel Quasar in 2018, includes a left-aligned chevron with black, brown, white, pink, and light blue stripes. The additional colors represent people of color, transgender and non-binary people, and people affected by HIV/AIDS.

*The Stonewall National Monument*

70.    On June 24, 2016, President Barack Obama issued Presidential Proclamation 9465, 81 Fed. Reg. 42215 (June 29, 2016), establishing the Stonewall National Monument under the Antiquities Act, 54 U.S.C. § 320301.

71.    The Stonewall National Monument is the first national monument in the United States dedicated to the LGBTQ+ rights movement. It encompasses approximately 7.7 acres, including the Stonewall Inn, Christopher Park, and several nearby streets and sidewalks in Greenwich Village, Manhattan.

72.    The proclamation explained that the purpose of establishing the monument at the site of the Stonewall Uprising was to "elevate its message and story to the national stage and ensure that future generations would learn about this turning point that sparked changes in cultural attitudes and national policy towards LGBT people over the ensuing decades." 81 Fed. Reg. 42215, 42218.

73.    The Presidential Proclamation requires the preparation of a management plan that "shall ensure that the monument fulfills the following purposes for the benefit of present and future generations: (1) to preserve and protect the objects of historic interest associated with the monument, and (2) to interpret the monument's objects, resources, and values related to the LGBT civil rights movement." *Id.*

74.    For many years, members of the LGBTQ+ community, including plaintiffs, advocated for a display of the Pride flag at the Stonewall Memorial. Since 2017, the Pride flag flew on a portion of the surrounding park owned by New York City. Nonetheless, activists, including Michael Petrelis and Steven Love Menendez, continued to advocate for a display of the Pride flag at the Stonewall National Memorial with authorization from the federal government.

75.    In 2021, citing the "significance of the rainbow flag to Stonewall National Monument and the community," NPS approved the installation of a flagpole that "complement[s] the historic iron fence surrounding the federally owned Christopher Park" and that would be "permanently located front and center in the beautiful gardens" inside the park. Ex. A, September 17, 2021 Letter from G. Vietzke, Regional Director, National Park Service to M. Petrelis.

76.    On June 1, 2022, an NPS superintendent Shirley McKinney, along with members of the LGBTQ+ community, ceremoniously raised the Progress Pride flag on a permanent flagpole at the Stonewall Memorial. *See Virtual Fence Exhibit - Stonewall National Monument (U.S.*

*National Park Service)* (accessed Feb. 17, 2026), https://www.nps.gov/ston/learn/ photosmultimedia/virtual-fence-exhibit.htm [https://perma.cc/G7T7-JB4T].

77.      The Progress Pride flag they raised reflected both its official status as part of the Stonewall National Monument, with its title, establishment date, and the NPS emblem, and its historical rooting. The flag's inscription of the word "Stonewall" replaced the "A" with a lower case Greek letter Lambda—λ—a symbol of LGBTQ+ activism adopted in the aftermath of the Stonewall Uprising. Dr. Gillian Murphy, *LGBTQI+ Symbols And Their Meanings*, LSE History (May 15, 2024), https://blogs.lse.ac.uk/lsehistory/2024/05/15/lgbtqi-symbols-and-their-meanings/.

78.      The raising of a Pride flag at the Stonewall National Monument was a watershed moment because it was the first Pride flag flown permanently on federal lands. At the time, the NPS explained that "[f]or many years, the rich histories of lesbian, gay, bisexual, transgender and

queer Americans have been erased through punishing laws and general prejudice. The National

Park Service is committed to telling the complex and diverse histories of all Americans." National

Parks     of     New     York     Harbor,     Facebook     (June     7,     2022),

https://www.facebook.com/NPSofNYHarbor/posts/pfbid025fgZ4HgsfooWdNHPtgtU9eSW6He

FUZVGo8SDhTsqixX7r1tpiaqnF26XSbEoYdMhl [https://perma.cc/6LHD-ZSSX].

79.    Sometime after the beginning of the current administration, NPS was ordered to fly

only a Rainbow Pride flag (either the original 8-color design or the popular 6-color design) and

not the Progress Pride flag.

80.    As of February 14, 2026, the NPS website about the Stonewall National Monument

displayed the official Rainbow Pride flag. *See Interpretative Flags - Stonewall National Monument*

*(U.S. National Park Service)* (accessed Feb. 17, 2026), https://www.nps.gov/ston/

learn/photosmultimedia/interpretative-flags.htm [https://perma.cc/BM6A-S7BT].



81.    The NPS website explained:

Visitors to Christopher Park will find the interpretive flag display featuring the Pride flag. The original Pride flag was debuted with eight colors in 1978, a few years after the Stonewall Uprisings, and each color symbolizes an aspect of the life and experience of the members of the community. It has since become an internationally recognized symbol.

*Id.*

*The January 21, 2026 Directive*

82.    On January 21, 2026, the Department of the Interior issued a directive titled "Guidance on the Display and Flying of Non-Agency Flags and Pennants within the National Park System." *See* Ex. B (the "Directive").

83.    The Directive states that "only the U.S. Flag, flags of the DOI, and the POW/MIA flag will be flown by the NPS in public spaces where the NPS is responsible for the upkeep, maintenance, and operation of the flag and flagpole," subject to several exemptions. *Id.* at 2.

84.    Critically, the exemptions include flags that "provide historical context." *Id.* at 3. According to the Directive,

The flying of non-agency flags and pennants within units of the National Park System on flagpoles, buildings, or other points of display managed, co-managed, or controlled by the NPS that fall under the following categories may also be permitted. These categories include flags and pennants that . . . provide historical context . . . [or] . . . are part of historic reenactments or living history programs.

*Id.*

85.    The Directive states that "Departmental policy on displaying and flying flags is found at 310 DM 5." "310 DM 5" refers to the Department of Interior Manual Part 310 Chapter 5 entitled "Flags." *See* Ex. C (the "Policy").

22

86.    The Policy describes the protocol for flying a U.S. flag and other authorized flags. It states that certain officials "may authorize the flying of flags and pennants, other than those described in this chapter, as appropriate, provided flags and flagpole space are available for this purpose." *Id.* at 6. The Policy does not state that only U.S. Flags, flags of the DOI, and the POW/MIA flag can be flown by the NPS. *Id.*

*The Removal of the Pride Flag*

87.    On or about February 9, 2026, NPS removed the Pride flag from the Stonewall National Monument without prior public notice or announcement.

88.    The flag's removal was discovered on February 9, 2026, when employees of the Stonewall Inn arrived for work.

89.    In response to press inquiries, NPS stated that it removed the flag to comply with the Directive, stating that "only the U.S. flag and other congressionally or departmentally authorized flags are flown on N.P.S.-managed flagpoles, with limited exceptions" and that "[a]ny changes to flag displays are made to ensure consistency with that guidance." Deena Zaru, *Trump Admin Removes Pride Flag From Stonewall National Monument*, ABC News (Feb. 10, 2026), https://abcnews.com/US/trump-admin-removes-pride-flag-stonewall-national-monument/story?id=130023944 [https://perma.cc/Q8RY-6N5U].

90.    NPS added that the monument "continues to preserve and interpret the site's historic significance through exhibits and programs," but did not explain how the flag removal is consistent with preserving that significance. *Id.*

91.    NPS did not explain why the Pride flag would not qualify for the "historical context" exemption, despite the monument being specifically designated to commemorate LGBTQ+ history.

92.     On February 11, 2026, NPS installed a United States flag in the flagpole that was installed by NPS in 2022 to display the Pride flag. *See* Swapna Venugopal Ramaswamy, *"We Will Not Be Erased": Stonewall Pride Flag Raised In Defiance*, USA Today (Feb. 12, 2026), https://www.usatoday.com/story/news/politics/2026/02/12/new-york-pride-flag-stonewall-monument-trump/88631061007/ [https://perma.cc/3S7K-WETN].

93.     On February 12, 2026, activists and local politicians held a demonstration at the Stonewall National Monument and raised an unofficial Rainbow Pride flag at the monument. *Id.*

94.     The unofficial flag was first raised by local politicians on a separate, shorter flagpole below the American flag. *Id.* Local activists later joined both flags with plastic zip ties and raised them together on the same flagpole. *Id.*



95.    The unofficial Rainbow Pride flag raised on February 12, 2026, does not include the NPS logo or text that appears on the official Rainbow Pride flag which normally flies at Stonewall.

96.    The unofficial flag was raised by private citizens, not by Defendants. Defendants have neither authorized the display of the unofficial Rainbow Pride flag at the monument nor stated that they will permit the unofficial flag to remain at the monument. Defendants have also not rescinded their earlier decision to remove the official Pride flag.

97.    Following the raising of the unofficial Rainbow Pride Flag, DOI said in a statement that the raising of the unofficial Pride flag amounted to "political pageantry" and that Defendants are going to continue to adhere to the existing rules, as arbitrarily interpreted by them, and "not make exceptions for Stonewall." Noorulain Khawaja, *Advocates Bring Pride Flag Back To Stonewall*, NY1 (Feb. 12, 2026), https://ny1.com/nyc/all-boroughs/news/2026/02/13/advocates-bring-pride-flag-back-to-stonewall [https://perma.cc/46UX-BCK8].

### *Pattern of Targeting the LGBTQ+ Community*

98.    This is the second time in less than a year that the Trump administration has targeted LGBTQ+ recognition at the Stonewall National Monument.

99.    In February 2025, the NPS removed any references to transgender people or gender identity from prominent sections of the monument's website and other materials, as well as any storytelling that incorporates discussion of gender identity or a person's experience, prompting hundreds of people to gather in protest at the monument. As a result, the NPS has sought to erase American history by erasing any mention of transgender people in relation to the Stonewall National Monument. *See* Juliana Kim, *Park Service Erases 'Transgender' On Stonewall Website,*

*Uses The Term 'LGB' Movement*, NPR (Feb. 14, 2025), https://www.npr.org/2025/02/14/g-s1-48923/stonewallmonument-transgender-park-service [https://perma.cc/8ZXE-WUT9].

100.    The NPS removed numerous other websites related to LGBTQ+ history, such as "The Pride Guide," "Philadelphia's Heritage of LGBTQ Activism," and websites that educated visitors about LGBTQ+ figures Marsha P. Johnson, Syliva Rivera, and Pauli Murray. *See* Press Release, *Parks Group Condemns Erasure of LGBTQ+ History from Park Service Website*, NPCA.org (Mar. 4, 2025), https://www.npca.org/articles/7142-parks-group-condemns-erasure-of-lgbtq-history-from-park-service-website [https://perma.cc/F7F2-5S7A].

101.    In response to these actions, the Stonewall Inn and the Stonewall Inn Gives Back Initiative said in a statement: "This blatant act of erasure not only distorts the truth of our history, but it also dishonors the immense contributions of transgender individuals - especially transgender women of color - who were at the forefront of the Stonewall Riots and the broader fight for LGBTQ+ rights." *See* Minyvonne Burke, *References To Transgender And Queer Removed From Stonewall National Monument's Web Page*, NBC News (Feb. 14, 2025), https://www.nbcnews.com/nbc-out/outnews/references-transgender-queer-removed-stonewall-monuments-webpage-rcna192204 [https://perma.cc/MX9B-PFXC].

102.    The administration has also targeted Pride flags at other federal facilities, including through a State Department order requiring that only U.S. flags be flown at American embassies and consulates worldwide—a reversal from the prior administration's practice of displaying Pride flags. Christine Hauser and Neil Vigdor, *Trump Administration Tells Embassies That 'Activist' Flags Won't Fly*, N.Y. Times (Jan. 24, 2025), https://www.nytimes.com/2025/01/24/us/embassy-us-flag-blm-gay-pride.html.

103.    The administration has also dismissed a former FBI agent for displaying a Progress Pride flag at his workstation. The agent had received the flag from the leadership of FBI's Los Angeles Field Office in recognition of his efforts to support the FBI's diversity initiatives.

104.    Federal employees at multiple agencies were ordered to remove pronouns from their email signatures, a common means of promoting gender inclusion and fostering a respectful workplace by normalizing gender diversity and signaling support for transgender and non-binary colleagues.

105.    Additionally, the administration has targeted the LGBTQ+ community in a litany of other ways, including: (a) the January 20, 2025, executive order purporting to repudiate the very existence of transgender people altogether by disclaiming that a person might have a gender identity different from their birth-assigned sex, which the order describes as a "false claim," rescinding protections for transgender people, and depriving them of access to services;[2] (b) the January 27, 2025, executive order banning transgender servicemembers from active duty, labeling them as incapable of an "honorable, truthful, and disciplined lifestyle," even in their personal lives, and describing them as having "false" identities "[in]consistent with the "humility and selflessness required of a service member";[3] (c) the January 28, 2025, executive order declaring it the "policy of the United States" not to "support the so-called 'transition' of a child from one sex to another," disparaging gender-affirming medical care as "destructive" and "maiming," and calling being

---

[2] Exec. Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).
[3] Exec. Order 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025).

transgender a "radical and false claim"; [4] and (d) February 5, 2025, executive order banning transgender athletes in government-funded sports activities.[5]

106.    Likewise, the National Institutes of Health terminated hundreds of research grants relating to LGBTQ+ people because, according to the Administration, "research based on gender identity … do[es] nothing to enhance the health of many Americans" and "ignore[s] biological realities." *Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Insts. of Health*, 795 F. Supp. 3d 678, 688, 696-97 (D. Md. 2025).

107.    In one particularly absurd example, the Defense Department flagged for deletion from its materials images of the B-29 aircraft Enola Gay, the bomber which dropped the first atomic bomb on Hiroshima, Japan, apparently because it included the word "Gay."

*Pattern of Selective Enforcement*

108.    While erasing the LGBTQ+ community and targeting the Pride flag, NPS has permitted other non-agency flags.

109.    For example, the NPS has had a longstanding policy permitting the display of Confederate flags and other symbols in cemeteries managed by NPS on certain days. Furthermore, the NPS permits display of Confederate flags for historical and interpretive purposes, for example at the Gettysburg National Miliary Park.

110.    The NPS does not prohibit sales of Confederate flag merchandise at gift shops located on its premises; instead, it has merely requested that its vendors voluntarily withdraw such items from the shops. In contrast, NPS has ordered the removal of all products recognizing the identities of LGBTQ+ people from its gift shops.

---

[4] Exec. Order 14187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8871 (Jan. 28, 2025).
[5] Exec. Order 14210, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025).

111.    The pattern demonstrates that the stated justifications for removal of the Pride flag are pretextual and that the true basis for the government's actions is targeting LGBTQ+ people and LGBTQ+ history, not a neutral application of policies. The government has systematically removed content and symbols associated with the LGBTQ+ community's identity and history— including the Pride flag, references to LGBTQ+ individuals, and LGBTQ+ educational materials—while preserving other non-agency displays.

*Injury to Plaintiffs*

112.    The government's removal of the official NPS-sanctioned Pride flag from the Stonewall National Monument causes ongoing injury to Plaintiffs.

113.    Even with the new unofficial flag temporarily raised by private citizens, Plaintiffs remain injured.

114.    The unofficial Pride flag raised by private citizens on February 12, 2026, was not authorized, installed, or maintained by NPS. The government has not rescinded its removal decision or authorized any Pride flag display at the monument. To the contrary, the government has explicitly disavowed it, reaffirmed the policy that led to the removal of the NPS-sanctioned Pride Flag, and stated that it will not make exceptions for Stonewall.

115.    Plaintiffs challenge NPS's removal of the official, NPS-authorized Pride flag that NPS rangers ceremonially installed on June 1, 2022, and NPS's ongoing prohibition on officially displaying the Pride flag.

116.    The Presidential Proclamation establishing the monument requires NPS—not private citizens—"to preserve and protect the objects of historic interest associated with the monument" and "interpret the monument's objects, resources, and values related to the LGBT civil rights movement." NPS cannot fulfill this mandatory duty by erasing a major and critical aspect

of the LGBTQ+ movement's struggle for equality, as symbolized by the Pride Flag for half a century. Nor can NPS circumvent this mandatory duty by merely temporarily tolerating a private display while denouncing the very presence of the Pride flag as "political pageantry" and prohibiting the presence of an NPS-sanctioned Pride Flag.

117.    Plaintiffs seek NPS's official authorization, installation, and maintenance of the Pride flag as part of the monument's interpretive, historical program—not merely the physical presence of a flag raised by private citizens in protest of NPS policy.

118.    Plaintiff Gilbert Baker Foundation suffered organizational harm as a result of destruction of resources the foundation expended on advocating for the Pride flag and continues to suffer an ongoing harm as a result of diversion of resources away from its educational and collaborative activities and towards the defensive activities in response to the flag removal as well as the unofficial replacement flag installed by community members.

119.    Plaintiff Charles Beal suffers an aesthetic harm due to his inability during his regular visits to the monument to enjoy the aesthetic, educational, and historical experience the monument was designated to provide.

120.    Plaintiff Village Preservation suffers organizational harm because the removal of the Flag undermines its achievement in establishing the National Monument, damages its education programming, undermines advocacy for other LGBTQ+ sites, and leads to diversion of resources.

121.    Plaintiff Equality New York suffers organizational and associational harm because the removal of the Flag both undermines its efforts to educate about the history of the uprising, the role of transgender people in the uprising and in advancing equality, and the history and purpose of the National Monument itself, and deprives its members of the ability to experience the

monument with the full historical context and symbolism for which it was designated, causing its members aesthetic and informational injury.

122.    Defendants' actions directly affect and interfere with the ability of Equality New York and its members from being able to utilize the Stonewall National Monument for its events, activism, and education programs in a manner that recognizes the importance of the Pride flag to the LGBTQ+ movement and that is as historically encompassing and accurate as possible.

123.    Equality New York and its members, including Eunic Ortiz, Melissa Sklarz, and Tanya Asapansa Walker, specifically are deprived of the aesthetic and educational experience of observing the Pride flag at the birthplace of the LGBTQ+ rights movement during their regular visits to the monument.

124.    All Plaintiffs suffer ongoing injury each day an NPS-sanctioned Pride flag remains absent from the monument.

125.    These injuries are redressable by an order requiring Defendants to restore the Pride flag to the monument.

**COUNT ONE**
**Violation of the Administrative Procedure Act**
**(§ 706(2)(A) — Arbitrary and Capricious)**

126.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

127.    The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

128.    Agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency also acts arbitrarily when it "ignore[s] its own regulations and policies." *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 995 (8th Cir. 2011).

129.    Defendants' removal of the Pride flag from the Stonewall National Monument was arbitrary and capricious for two independent reasons: (1) it was based on a flawed interpretation of their own policies, and (2) the reasons provided by the agency were pretextual.

*Defendants Misinterpreted Their Own Policies.*

130.    Defendants claim that the Pride flag was removed from the Stonewall National Monument to "ensure consistency" with guidance regarding flag displays on NPS-managed flagpoles. This explanation does not hold up to scrutiny.

131.    According to NPS, flag displays are governed by 310 DM 5—the Policy—and the January 21, 2026 memorandum—the Directive.

132.    But neither guidance document requires the removal of the Pride flag from Stonewall:

a.    The Policy permits officials to "authorize the flying of flags and pennants, other than [U.S. and DOI flags], as appropriate, provided flags and flagpole space are available for this purpose." Ex. C. at 6.

b.    The Directive provides an exemption for flags that "provide historical context." Ex. B. at 3.

133.    The conditions laid out in the Policy and the Directive were all satisfied here:

a.    Flagpole space and flags were available.

b.  The Pride flag—a universally recognized symbol of the LGBTQ+ community—provides historical context for the first national monument dedicated to LGBTQ+ history and rights. *See* Ex. A (NPS stating that "[a]s an agency, we recognize the significance of the rainbow flag to Stonewall National Monument and the community."); *see also* Presidential Proclamation 9465 (stating that the purpose of the designation was to "to preserve and protect the objects of historic interest associated with the monument" and "interpret the monument's objects, resources, and values related to the LGBT civil rights movement").

134.    Therefore, under the policies that they are purporting to be implementing, Defendants had discretion to allow the Pride flag to be displayed at the Stonewall memorial. This is exactly what NPS did in 2022. *See* Ex. A.

135.    In other words, removal of the flag was not required to "ensure consistency" with Defendants' regulations, contrary to Defendants' statements.

136.    Accordingly, to the extent Defendants' actions were driven by a mistaken or incorrect belief that they were required under their policies, they were arbitrary and capricious. *See United States v. Int'l Bhd. of Teamsters*, 170 F.3d 136, 143 (2d Cir. 1999) (when an agency acts "as a result of an exercise of discretion that is impermissibly limited as a result of a mistaken view by the agency as to the scope of its discretion . . . there has been a misunderstanding of law" and the action is "arbitrary and capricious").

*Defendants' Reasons Were Pretextual.*

137.    Separately, Defendants' removal of the flag is arbitrary and capricious because their reasons for it were pretextual.

138.    As detailed above, the removal of the Pride flag is one of a long list of anti-LGBTQ+ actions taken by the administration in the last year, including at Stonewall. *See supra* ¶¶ 98–107. These actions alone support a strong inference of animus against the LGBTQ+ community and that Defendants' reasons for removing the flag were pretextual.

139.    The inference of animus is further strengthened by the targeting of enforcement: not exercising discretion with respect to an LGBTQ+ symbol while permitting other non-agency flags under the "historical context" exemption, such as Confederate flags. *See supra* ¶¶ 108–111.

140.    Because Defendants' reasons were pretextual and based on an impermissible reason, *i.e.*, animus toward the LGBTQ+ community, they are arbitrary and capricious. *See Dep't of Com. v. New York*, 588 U.S. 752, 784 (2019).

141.    For these reasons, Defendants' actions violate the APA.

**COUNT TWO**
**Violation of the Administrative Procedure Act**
**(§ 706(2)(A) and (C) — Arbitrary and Capricious, Contrary to Law)**
**Contrary to Presidential Proclamation and the Foundation Document**

142.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

143.    Presidential Proclamations issued under the Antiquities Act have the force and effect of law. *See Cameron v. United States*, 252 U.S. 450, 455 (1920).

144.    On June 24, 2016, President Barack Obama issued Presidential Proclamation 9465, 81 Fed. Reg. 42215 (June 29, 2016), establishing the Stonewall National Monument under the authority of the Antiquities Act, 54 U.S.C. § 320301.

145.    The Proclamation mandates that the Secretary of the Interior "shall manage the monument through the National Park Service, pursuant to applicable legal authorities, consistent with the purposes and provisions of this proclamation." 81 Fed. Reg. 42215. 42218.

146.     The Proclamation further mandates that the Secretary "shall prepare a management plan, with full public involvement and in coordination with the City shall ensure that the monument fulfills the following purposes for the benefit of present and future generations: (1) to preserve and protect the objects of historic interest associated with the monument, and (2) to interpret the monument's objects, resources, and values related to the LGBT civil rights movement." *Id.*

147.     In May 2019, after consultation with community partners, the NPS issued the Foundation Document for the Stonewall National Monument (the "Foundation Document"). *See* Ex. D. The Foundation Document sets out the monument's purpose, significance, fundamental resources and values, and interpretive themes.

148.     The Foundation Document is "an adequate basis upon which to consider NPS's change in policy." *City of Phila. v. Burgum*, No. 26 Civ. 464 (CMR), ECF No. 53 at 31 (E.D. Pa. Feb. 16, 2026).

149.     According to the Foundation Document, the "purpose of Stonewall National Monument is to preserve and protect Christopher Park and the historic resources associated with it and to interpret the Stonewall National Historic Landmark's resources and values related to the lesbian, gay, bisexual, and transgender civil rights movement." *Id.* at 9.

150.     The Foundation Document further explains that the "Stonewall National Monument commemorates an event that symbolizes decades of personal sacrifice, protests, and political and legal advocacy by LGBTQ people that continue to inspire and bring attention to the ongoing pursuit for civil rights and equality on the basis of sexual orientation and gender identity and expression." *Id.* at 10.

151.     One of the fundamental resources and values identified in the Foundation Document is a "National Stage for Public Expression, Commemoration, and Public Engagement,"

specifically, "learning opportunities to raise public awareness about LGBTQ history, the effects of injustice, and foster an interest in preserving the monument's resources and lessons." *Id.* at 11.

152.    The Foundation Document also explains that the interpretive themes of the monument include "LGBTQ Civil Right Movement" and its legacy. *Id.* at 12.

153.    For nearly half a century, the Pride flag has served not only as a symbol for the LGBTQ+ movement, but as a direct way to express presence and identity. The Pride flag's very presence is synonymous with the history and values related to the LGBTQ+ civil rights movement.

154.    The NPS indeed previously recognized the "the significance of the rainbow flag to Stonewall National Monument and the community" when it approved and installed a new permanent flagpole inside the monument specifically for the purpose of flying the Pride flag. *See* Ex. A.

155.    The targeted removal of the Pride flag is in direct contradiction with the LGBTQ+ civil rights movement.

156.    Defendants thus acted arbitrarily and capriciously and in violation of the proclamation and the Foundation Document by failing to account for the Pride flag's importance to the LGBTQ+ movement or considering how the removal of the flag would serve the monument's purpose "to interpret the monument's objects, resources, and values related to the LGBT civil rights movement."

157.    Furthermore, the proclamation commanded that the Secretary's management plan consider "full public involvement." 81. Fed. Reg. 42215, 42218. To the extent the government's removal of the flag represents a shift in the management plan of the Stonewall National Monument to something other than the Foundation Document, Defendants have not prepared a new management plan with "full public involvement."

158.     Plaintiffs represent knowledgeable members of the LGBTQ+ community whose views on "the monument's objects, resources, and values related to the LGBT civil rights movement" should have been, and have not been, considered.

159.     Defendants thus acted arbitrarily and capriciously and in violation of the proclamation by failing to consult with the public to the extent their actions were based on an unannounced shift away from the monument's Foundation Document.

### COUNT THREE
**Violation of the Administrative Procedure Act**
**(§ 706(2)(A) and (C) — Contrary to Law)**
**Violation of the National Historic Preservation Act**

160.     Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

161.     Section 106 of the National Historic Preservation Act requires federal agencies to "take into account the effect of the undertaking on any historic property" before approving any undertaking. 54 U.S.C. § 306108.

162.     Section 106 implementing regulations define an "undertaking" as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license or approval." 36 C.F.R. § 800.16(y).

163.     The regulations require agencies to assess whether an action will have an "adverse effect" on a historic property, including effects on the property's "location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(a)(1). Examples of adverse effects include "[c]hange of the character of the property's use or of physical features within the property's setting that contribute to its historic significance." *Id.* § 800.5(a)(2)(iv).

164.    When an adverse effect is found, agencies must consult with the State Historic Preservation Officer, the Advisory Council on Historic Preservation, and other consulting parties to resolve the adverse effect. 36 C.F.R. § 800.6.

165.    Stonewall National Monument is a historic property: (a) it was listed on the National Register of Historic Places in 1999; (b) it was designated as a National Historic Landmark in 2000; and (c) it was designated as a National Monument in 2016 specifically for its association with LGBTQ+ history.

166.    The Pride flag has been part of the monument's setting since its designation or shortly thereafter and contributes to the monument's "feeling" and "association" with LGBTQ+ history and the Pride movement and thus to its "historic significance." 36 C.F.R. § 800.5(a)(1), (a)(2)(iv).

167.    The NPS's removal of the Pride flag is an "undertaking" within the meaning of Section 106 because it is a federal "activity" that that is under "direct . . . jurisdiction of a Federal agency" and "carried out by . . . a Federal agency," namely, the DOI and the NPS. 36 C.F.R. § 800.16(y).

168.    The removal has an "adverse effect" on the monument because it alters the property's "feeling" and "association" with LGBTQ+ history in a manner that diminishes the monument's "historic significance" as the first national site dedicated to commemorating the LGBTQ+ rights movement. 36 C.F.R. § 800.5(a)(1), (a)(2)(iv).

169.    Upon information and belief, Defendants failed to comply with Section 106 before removing the Pride flag. Specifically, Defendants failed to:

    a.    Assess whether the removal would have an adverse effect on the historic property;

     b.   Consult with the New York State Historic Preservation Officer;

     c.   Consult with the Advisory Council on Historic Preservation;

     d.   Provide opportunity for public input on the proposed action;

     e.   Consider alternatives to removal; or

     f.   Seek ways to avoid, minimize, or mitigate adverse effects.

170.    Section 106's procedural requirements are mandatory. Agencies must comply with these procedures before taking actions that affect historic properties.

171.    Defendants' failure to comply with Section 106 renders their action not in accordance with law under 5 U.S.C. § 706(2)(A) and contrary to law under 5 U.S.C. § 706(2)(C).

**COUNT FOUR**
**Declaratory Judgment Act**
**(28 U.S.C. §§ 2201 and 2202)**

172.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

173.    Plaintiffs are entitled to declaratory relief on the basis of all claims identified. There is a substantial and ongoing controversy between Plaintiffs and Defendants, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that Defendants' removal of the Pride flag from the Stonewall National Monument violated the APA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

     a.   Declare that Defendants' removal of the Pride flag from the Stonewall National Monument was arbitrary and capricious, and contrary to law;

     b.   Vacate the decision to remove the official NPS Pride flag from the Stonewall National Monument;

c.    Order Defendants to immediately restore the official NPS Pride flag to the Stonewall National Monument;

d.    Permanently enjoin Defendants from removing the flag without, at minimum, complying with Section 106 of the National Historic Preservation Act;

e.    Award Plaintiffs their costs and reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable provision of law; and

f.    Grant such other and further relief as the Court deems just and proper.


Dated: February 17, 2026                     Respectfully submitted,
      Washington, DC

                                                   **WASHINGTON LITIGATION GROUP**

                   By:    /s/ Alexander Kristofcak
                           Alexander Kristofcak**
                           Mary L. Dohrmann*
                           Sydney Foster*
                           Kyle R. Freeny*
                           James I. Pearce*
                           Nathaniel A.G. Zelinsky*
                           1717 K Street, NW, Suite 1120
                           Washington, D.C. 20006
                           (202) 521-8734
                           akristofcak@washingtonlitigationgroup.org

                           **LAMBDA LEGAL DEFENSE**
                           **AND EDUCATION FUND, INC.**

                           Karen L. Loewy
                           Omar Gonzalez-Pagan
                           Jennifer C. Pizer
                           Nephetari Smith*
                           120 Wall Street, 19th Floor
                           New York, NY 10005
                           (212) 809-8585
                           kloewy@lambdalegal.org

Douglas F. Curtis
Camilla B. Taylor
Kenneth D. Upton, Jr.*
3656 N. Halsted St.
Chicago, IL 60613
(312) 663-4413

*Counsel for Plaintiffs*

*\*Pro Hac Vice applications forthcoming*
*\*\* Admitted only in California and New
York; practicing under the supervision of
D.C. Bar members*